GREENBERG, APPELLANT, *v.* THE L. I. SNODGRASS CO.
ET AL., APPELLEES.

308

(No. 7698—Decided March 23, 1953.)

*Messrs. Paxton & Seasongood, Mr. Joseph A. Segal* and *Mr. William T. Bahlman, Jr.,* for appellant.

*Mr. Jerome Goldman* and *Mr. John P. Strother,* for appellees.

Ross, J. A motion was filed by the plaintiff to dismiss a so-called "cross appeal," stated to have been filed in the case before us by the defendant.

An examination of the record, including the original papers and the transcript of the docket and journal

entries, fails to show the filing of any notice of appeal in this cause by the defendant. Even if such notice of appeal had been filed, it would not be a part of this appellant's appeal. There is no provision, either in our statutory procedural law applicable to appellate practice in the Courts of Appeals or in the rules of such courts, recognizing the right to file a "cross appeal."

What the statutes do recognize and permit is the right of any *party* to file a notice of appeal from a judgment which he considers erroneously prejudicial to his rights in law or equity. Section 12223-15, General Code. When such a notice of appeal is filed and proper steps are taken to perfect the appeal in the Court of Appeals, such action by the party constitutes an appeal from such judgment, separate and distinct from any other appeal which may have been taken therefrom. No party can inject consideration of his appeal into a proceeding instituted and perfected by another party to the cause.

By virtue of Section 12223-21*a*, General Code, any appellee is given permission to file assignments of error, and the Court of Appeals, in case of reversal of the judgment of the trial court, is required to pass upon such assignments of error. The futility of this statute is shown in the case of *New York Life Ins. Co.* v. *Hosbrook*, 130 Ohio St., 101, 196 N. E., 888, 118 A. L. R., 1283, where, in the second and third paragraphs of the syllabus, it is stated:

"The procedural doctrine announced in *Gohman* v. *City of St. Bernard*, 111 Ohio St., 726, is not consonant with the principles of judicial procedure upheld by the Supreme Court of this state. The claim that an inferior court can forestall review by our state Supreme Court rests upon a doctrine which is repugnant not only to our established judicial system but also to Section 2, Article IV, Constitution of Ohio, which confers on the Supreme Court express authority to 're-

view, and affirm, modify or reverse the judgment of the Court of Appeals.' (The first and second propositions of the syllabus in *Gohman* v. *City of St. Bernard, supra,* overruled.)

"Where, on a first hearing, a Court of Appeals has committed prejudicial error in determining the 'law of the case' for the guidance of the trial court after remand, and, upon a later hearing adheres to such determination, this court, as the last state court of review, will disturb such former determination of the Court of Appeals and will reverse its judgment, where it results from such erroneous determination."

What possible salutary effect is produced, therefore, by the provisions of Section 12223-21*a*, General Code?

In view of the decision of this court to merely modify the judgment of the trial court, the provisions of Section 12223-21*a*, General Code, are not considered applicable herein.

The motion of the plaintiff to dismiss the alleged "cross appeal" of the defendant is overruled, for the reason that no such appeal is presented by the record before this court.

The motion of the defendant to dismiss the appeal of plaintiff is also overruled, there being no showing that defendant was prejudiced by the delay of six days in filing the assignments of error and briefs of plaintiff.

The appeal of the plaintiff raises the primary question whether a deed to a lot in a city, described by subdivision numbers and metes and bounds, including a boundary along the line of a vacated street adjacent to such lot, transfers all interest of the grantor to one-half of the abutting portion of such vacated street, in the absence of definite reservations by the grantor clearly indicating that the appropriate portion of the vacated street was not conveyed by the deed.

The northern portion of the Stephen Kemper subdivision is located between Kenton street on the west,

McGregor avenue (a vacated street) on the north, and Florence avenue on the east. Lots 62, 64, 66, 68, 70, 72, and 74 front on Kenton street. Lots 65, 67, 69, 71, and 73 front on Florence avenue. Lot 75 has a frontage on Florence avenue and McGregor avenue.

It is the one-half portion of vacated McGregor avenue, abutting upon the north line of lot No. 75, which is the subject of this litigation.

It appears from the record that McGregor avenue is 50 feet in width and extends westwardly from Concord avenue (a street extending north and south, which joins Florence avenue at a wide angle and at the northeast corner of lot 75) to Kenton street. The west boundary of lot 75 is a vacated alley, one-half of which has been included in deeds to lot 75. The rear of lot 75 is at the foot of a steep hill, some 50 feet high, which continues across McGregor avenue. It thus appears that the portion of vacated McGregor avenue, to the east of this steep hill, which is the area involved in this litigation, could not possibly be of any use to the property owners on McGregor avenue to the west of the brow of this hill.

The defendant has erected a building, occupying the north one-half of McGregor avenue, opposite lot 75 which is owned by the plaintiff. This leaves a space 25 feet in width and approximately 100 feet in length between the building of plaintiff located on lot 75 and that of defendant. This space extends from Concord street to the foot of the hill in vacated McGregor avenue and to all intents and purposes is a vacant lot 100 feet by 25 feet, to which access could be had only from Concord street. A sidewalk seven feet in width extends from Concord street along the north line of the building on lot 75, to the rear of the building and is the only means of access to the upper floor, north apartment in this building. The north line of this building is seven inches from the south line of Mc-

Gregor avenue, so that the major portion of the sidewalk is and has been for many years in McGregor avenue.

The plaintiff is now the owner of lot 75 and claims that he owns one-half of McGregor avenue adjacent to such lot No. 75 in fee, or that he has a right of way over the same, or that he has a right of way over the sidewalk which extends along the north side of his building located on lot 75.

At the time McGregor avenue was vacated, one Harry Braudy owned lot No. 75.

What interest did Braudy acquire in this cul-de-sac, some 25 by 100 feet in area, upon such vacation?

In *Kinnear Manufacturing Co.* v. *Beatty,* 65 Ohio St., 264, 62 N. E., 341, 87 Am. St. Rep., 600, it is stated in the syllabus:

"Where a street or alley is vacated by a city, the vacated portion reverts to the abutting lot owners, subject, however, to such rights as other property owners on the street or alley may have therein, as a necessary means of access to their property.

"A property owner on a street or alley, a portion of which, other than the part on which he abuts, is vacated by the city council, has no right to enjoin the obstruction of the vacated portion by the owners to whom it reverted, where he has reasonable access to his property by other streets and alleys, although the distance he may have to travel in some directions may be greater than before the vacation. To entitle a party to any relief in such cases, the inconvenience he suffers must differ in kind from that of the general public, and not only in degree.

"The rights of the lot owners in an addition, on the plat of which the streets and alleys are indicated as dedicated to public use, are no greater than, nor different from, the rights of other lot owners upon other streets of the city.

"The provision in Section 2654, Revised Statutes, that when a street or alley is vacated by a city council, 'the right of any lot owner shall not be impaired thereby,' simply preserves such rights as the lot owner had in the street or alley by existing law. It creates no new rights."

To the same effect is *New York, Chicago & St. Louis Rd. Co.* v. *Bucsi,* 128 Ohio St., 134, 190 N. E., 562, 93 A. L. R., 632.

Applying these authorities to the question presented, as framed in the facts and circumstances of this case, it appears that Braudy to all intents and purposes owned a fee in such cul-de-sac, *i. e.,* the one-half of McGregor avenue, abutting on lot 75, after it was vacated. No other property owner on McGregor avenue could have any interest in this cul-de-sac, especially as all such owners had access to the general street system of the city of Cincinnati.

It now becomes necessary to review the several incidents which resulted in the plaintiff's title to lot No. 75.

From the record it appears that on December 10, 1925, Harry Braudy was the owner of lot No. 75, in Kemper's subdivision in the city of Cincinnati.

On October 27, 1926, McGregor avenue was vacated by ordinance of the council of Cincinnati.

An alley to the west of lot No. 75 had been vacated previously to the acquisition of such lot by Braudy.

On November 29, 1927, Braudy conveyed lot No. 75 to Incornato Coletta. The description in this deed furnishes a basis for the principal controversy between the parties to this action. Included in this conveyance were lots other than lot No. 75.

The description employed in this general warranty deed is as follows:

"The following described real estate situate in the city of Cincinnati, county of Hamilton, and state of

Ohio, and being known as all of lots 67, 69, 71, 73 and 75 of the subdivision made by the heirs of Stephen Kemper, as the same is recorded in plat book No. 1, pages 12 and 15, of the plat records of Hamilton county, Ohio, together with the east half of Farran alley, vacated, which part of said alley is described as follows:

"Beginning at a point in the south line of McGregor avenue one hundred (100) feet west of Florence avenue; thence west along McGregor avenue, ten (10) feet, and from said point extending southwardly between parallel lines at right angles to McGregor avenue a distance of one hundred (100) feet to the south line of lot No. 69 of said subdivision, above mentioned, extended westwardly to the center of said alley, and being the same premises conveyed to the grantor herein by Samuel Goldberg by deed recorded in deed book 1378, page 343 of the deed records of Hamilton county, Ohio.

"Said entire tract being more particularly described as follows, viz: Beginning at a point in the west line of Florence ave. where the same is intersected by the south line of McGregor avenue; thence west with the south line of McGregor avenue, one hundred and ten (110) feet to the center of the vacated alley; thence south along the center of said alley, one hundred (100) feet to a point; thence east on a line parallel with the south line of McGregor avenue ten (10) feet to the west line of lot No. 67; thence south with the west line of lot 67, twenty-five (25) feet to the south line of lot 67; thence east with the south line of lot 67, twenty-three (23) feet more or less to the west line of Florence avenue; thence north along the west line of Florence ave. one hundred and thirty (130) feet, more or less to the place of beginning, and being the same premises conveyed to Harry Braudy by two deeds one from Samuel Goldberg and wife, dated December 10,

1925 and recorded in deed book 1378, page 343, and the other from Morris Kasfir, et al., dated December 10, 1925 and recorded in deed book 1374, page 572, records of Hamilton county, Ohio.

"And all the estate, title and interest of the said Harry Braudy either in law or equity of, in and to the said premises; together with all the privileges and appurtenances to the same belonging, and all the rents, issues and profits thereof."

It is evident that Braudy at the time he executed the Coletta deed *knew* he owned one-half of the vacated alley to the west of lot No. 75, for the metes and bounds description in the deed from Braudy included such one-half, and it is also apparent from facts to be recited that Braudy *did not know* he owned the abutting one-half of the vacated McGregor avenue at the time he executed the Coletta deed. So, in passing, it is plain that he could not and did not include in his deed to Coletta any words reserving transfer of his interest in the cul-de-sac constituting the one-half of McGregor avenue abutting on lot No. 75.

By various mesne conveyances the plaintiff ultimately acquired the title to lot No. 75.

In the chain of title of the plaintiff appears a deed dated November 29, 1927, from Harry Braudy to Incornato Coletta; a deed dated October 23, 1929, from Incornato Coletta (Braudy's grantee) to Antonio Coletta; a deed dated January 15, 1937, from the heirs of such grantee to Maurice Stoller; and a deed dated August 6, 1937, from such grantee to plaintiff.

After the vacation of McGregor avenue in 1926, taxes on the abutting south one-half thereof were assessed against Harry Braudy. Such portion of the vacated street was placed on the tax duplicate in the name of Harry Braudy and there remained until sold in 1950 by Braudy to the defendant. The taxes remained delinquent until 1937, when Braudy made ar-

rangements to pay the same, and he continued to pay taxes thereon until 1950.

The defendant, after the conveyance to it, threatened to erect a building on its property, including the abutting south one-half of vacated McGregor avenue. The instant litigation was instituted to secure a declaration of the rights of plaintiff, alternative positions being presented as hereinbefore noted. The manner in which Braudy became aware that the abutting vacated portion of McGregor avenue was listed in the county records in his name for taxes was through a man by the name of McKeehan, who was, successively, a tenant of Coletta, Stoller, the plaintiff, and Braudy. From the record it appears that McKeehan rented a portion of the premises located on lot No. 75 from Coletta in 1930.

McKeehan testified as follows:

"Q. Who was the owner? To whom did you pay rent for the apartment? A. I paid rent, and my dad paid rent for the two lower apartments at 2251 Florence avenue, and second floor, with the idea that we could use the adjoining lot in our business for parking, and we rented it at that time and continued to use the same until 1937 when we changed and paid rent to Mr. Braudy.

"Q. Now, from 1930 to 1937, to whom did you pay rent for that property? A. We paid rent to Mr. Coletta.

"Q. When you moved in there, was anything said by you to Mr. Coletta with regard to the use of the vacated land? A. Yes, he said that that lot belonged to that side of the house and by renting the two flats, we would have possession of the entirety."

This tenant placed an ice house on McGregor avenue, which he used from 1930 until 1937.

McKeehan testified further:

"A. In 1937 the property had changed hands about

a year before, and it was then owned by Mr. Stoller of whom they tried to interest me in the purchase of the property.

"Q. When you say property, what property do you mean? A. The house, and the lot of which he represented went with the house. He gave me a card of general information on the property, taxes, etc., and I went down to the court house to check against the card regarding the taxes, and on the plat I found as to where a Mr. Braudy was the owner of the adjoining lot.

"Q. What plat was that, the auditor's plat? A. In the auditor's office, that's right.

"Q. And that showed the adjoining lot in Mr. Braudy's name? A. That's right. On Mr. Stoller's return in regard to the purchase of the property, I told him what that I had found, and he said that evidently * * *.

"Mr. Strother: We object to what he says.

"Q. Did you then go to see Mr. Braudy? A. He suggested that we look up Mr. Braudy and try to purchase the lot.

"Q. Did you look him up? A. That's right, so I looked Mr. Braudy up and at the time that I found Mr. Braudy he was in the hotel on Sixth street. I consulted him about the property. Mr. Braudy said that he no longer was interested in the property as he had sold it some years before.

"Q. What property was that that he was talking about? A. The property on Florence avenue.

"Q. The vacant lot or the building that he said he had no interest in it? A. I didn't speak of it particularly as the vacant land. I said the property. So I told Mr. Braudy that on my information at the court house, that I found that he was the owner of the lot that adjoined the property. I asked him if he wished to sell it, and he said that he at first would have to

consult his attorney. Several days later there was a meeting between Mr. Stoller, Mr. Braudy, and myself, and at the meeting Mr. Braudy wanted a thousand dollars for the lot, of which that I refused. I wasn't interested at that price. So Mr. Braudy said that he then would want to rent it to me at $35 a month, which I told him was too high, that I had made arrangements with the man next door to move on his lot for $10 a month. So he said if I would then consider to stay, that I could have the lot for $10 a month, of which I have been paying ever since up until April of 1950.

"Q. And when you spoke to Mr. Braudy about buying or purchasing or leasing the lot, that was the first time you had ever spoken to him? A. That's right, sir.

"Q. And you knew at that time, did you not, that Mr. Stoller owned the building. A. That's right.

"Q. So that I take it which you were seeing Mr. Braudy about was to buy or lease the lot? A. That's right.

"Q. And what if anything did Mr. Braudy say as to his ownership of the lot the first time you spoke to him? A. He said that he had no more interest in it, that he had sold the property some time before."

This witness testified further that a sidewalk had extended along the north side of the building on lot 75, from Concord street back to the rear of such building, since his occupancy of the upstairs apartment in 1930, so that apparently the sidewalk was in its present position when the property was acquired by Braudy and prior to its sale to Coletta, and when McKeehan became a tenant of a part of it.

The defendant predicates his claim to title and occupancy of the abutting south half of McGregor avenue upon Braudy's deed to him and Braudy's title thereto. If Braudy sold his right in such one-half of the vacated street to Coletta, then the plaintiff is entitled to a

declaration awarding him all the rights in vacated McGregor avenue which Braudy acquired upon the vacation thereof, which, as has been noted hereinbefore, amounted to a full fee in the abutting one-half portion.

Reviewing the facts stated, it is obvious, as hereinbefore noted, that when the vacation of McGregor avenue occurred, Braudy was ignorant of the law by which he acquired certain rights in the abutting one-half of the vacated street. This is clearly shown by his failure to pay the taxes assessed against the one-half of the street attaching to lot No. 75, his failure to exercise any dominion over it, although it was obviously occupied by a sidewalk and building (or ice house), which both were openly antagonistic to his rights, his statement of his ignorance of such rights to McKeehan, and his statement that he had no interest whatever in the vacated street. The accretion to lot 75 was not something personal to Braudy. It was an addition by law to the adjacent property, so that when the principal property, lot No. 75, was transferred and conveyed, the vacated abutting area automatically went with it. Although there is authority to the effect that real estate may not be appurtenant to real estate, it is evident from the full terms of Braudy's deed to Coletta that he intended to convey all of lot No. 75 and anything that was appurtenant thereto. It must be apparent that he concluded that any interest in the cul-de-sac went with lot No. 75, since he stated he had no interest in it.

It appears from the evidence that Braudy was physically disabled by an infirmity, and it becomes clear that he wished to dispose of all he possessed in connection with lot 75 and the lots adjacent thereto.

The promulgation of a principle of law by which a vacated street abutting real estate should be permitted to dangle indefinitely in a nebulous state of ownership

after a deed of the principal lot without reservation would present a state of uncertainty not to be desired as a part of our law pertaining to real property.

This is much more artistically stated by the late Chief Justice Taft in the case of *Paine* v. *Consumers' Forwarding & Storage Co.,* 71 F., 626, 632, in an opinion written by him when he was a judge on the Sixth Circuit Court of Appeals:

"The evils resulting from the retention in remote dedicators of the fee in gores and strips, which for many years are valueless because of the public easement in them, and which then become valuable by reason of an abandonment of the public use, have led courts to strained constructions to include the fee of such gores and strips in deeds of the abutting lot."

Although the authorities are not unanimous upon the subject, we consider the better rule to be that, regardless of whether the boundary lines mentioned in a deed are along the line of a street or simply along a street, in the absence of words of reservation, the grantor conveys title to one-half of that portion of a vacated street abutting upon the property sold, subject to the easement of other property holders on the street who may need the vacated street for purposes of ingress and egress to and from their abutting properties.

In *Mount Union College* v. *Mistelski,* 22 N. P. (N. S.), 504, 31 O. D., 219 (a case in which the judgment was affirmed by the Court of Appeals upon the reasoning and conclusions of the judge of the Court of Common Pleas), it is stated in the opinion at page 514:

"Therefrom, I think, it may be deduced that it is very unusual and almost unprecedented for a land owner to sell the abutting property, and at the same time retain the fee of the highway, subject to the easement, and that only in a case where there is an affirmative showing that such was the intention of the parties

from the instruments and all the circumstances of the case should such a drastic and exceptional situation be recognized. I, therefore, feel that in the light of *Keer* v. *Commissioners, supra; Atchinson & Topeka R. R. Co.* v. *Patch,* 28 Kansas, 470; *Paine* v. *Storage Co., supra; Holloway* v. *Southmayd,* 139 N. Y., 390; Elliott on Roads and Streets, Section 1190, that the latter authorities recognize the more just rule.

"Applying those principles under which those cases, upon these points, are decided, on both sides of the question, the conclusion that I have reached is that under the Ohio law, a property right which by accretion passed to the owner of the abutting lot, in the absence of any express provision or intention to the contrary, at the time of executing the land contract, must pass to and become the property of the plaintiff under said land contract, as a part of the privileges and appurtenances thereunto belonging."

To the same effect is *Paine* v. *Consumers' Forwarding & Storage Co.,* 71 F., 626, 629, noted, *supra*, and *Finlaw* v. *Hunter,* 87 Ohio App., 543, 96 N. E. (2d), 319.

Bearing in mind that Braudy as grantor was ignorent of his rights in the vacated McGregor avenue; that, therefore, he could have used no words of reservation as to such rights in conveying lot No. 75 to Coletta; and that such conveyance constituted a full and complete transfer of any title and all right, title and interest Braudy had in such lot abutting on McGregor avenue, we conclude that by such conveyance Braudy transferred to Colletta and his heirs and assigns all his interest in the vacated McGregor avenue, which by law may have accrued to such lot No. 75 while Braudy held title thereto.

It, therefore, appears from the authorities noted that Braudy conveyed what interest he acquired upon vacation of McGregor avenue by the deed to Coletta,

and that, since the plaintiff through mesne conveyances has acquired all interest so acquired by Braudy, the plaintiff has essentially all the rights in the one-half portion of McGregor avenue abutting on his property which he would have if he possessed the full fee thereof. The only outstanding interest against such fee would be the easements of other property owners on McGregor avenue who had no other means of access to the city street system, and the record shows that none exists.

It is our further conclusion that the undisputed facts show that the plaintiff, as a successor grantee of Braudy, is entitled to all the rights which Braudy had in the vacated McGregor avenue cul-de-sac at the time of his conveyance to Coletta, and that the defendant, claiming under deed from Braudy has no rights in the south one-half of such vacated McGregor avenue and will be enjoined from asserting any rights in such vacated street antagonistic to the rights of the plaintiff acquired by mesne conveyance from Braudy, being all the rights that Braudy acquired by virtue of the vacation of McGregor avenue and his title to property abutting thereon at the time of such vacation.

Manifestly, the defendant has no right to erect a building or other obstruction in the abutting south one-half of McGregor avenue.

The judgment of the trial court is modified in conformity to this opinion, and final judgment in this court entered accordingly.

*Judgment accordingly.*

MATTHEWS, P. J., ROSS and HILDEBRANT, JJ., concur in the syllabus, opinion and judgment.