ORDING, PLAINTIFF, *v.* SALINGER ET, DEFENDANTS.

Common Pleas Court, Miami County.

No. 37672. Decided February 28, 1961.

*Messrs. Marshall & Wills,* for plaintiff.
*Messrs. Shipman & Utrecht, Mr. James Utrecht,* of counsel, for defendant, Joyce J. Salinger and Krogers.

PORTER, J. This is a suit in which an owner of land which abuts a recently vacated alley seeks to have his neighbor enjoined from closing the alley, the title to which reverted to the neighbor upon the vacation. Several questions of interest and difficulty are presented by the facts, a detailed statement of which is therefore necessary.

The property involved is just south of Troy on old route 25 just south of the underpass. Plaintiff's property lies to the north of that of the defendant, Salinger. On plaintiff's land there is a large building currently used as a fruit market, formerly as a garage. The alley is between that and the land to the south, on which a building has been erected and leased to Kroger for a supermarket. Before an injunction could be issued the alley in question was blacktopped for the supermarket parking lot. This has a curbing on the north. The building on plaintiff's land is situated so close to this curbing that he can no longer get around to the back of his building on that side. He and his predecessors in title formerly used the alley for such purpose. Plaintiff can still get around to the back of his building on the north side but claims he can only do so by foregoing plans to enlarge in that direction and claiming also that it is not as convenient anyhow since he is not

able to go clear around his building and for other reasons which will be mentioned later. The land in front of plaintiff's building is used as a parking lot for customers and for display purposes.

The alley was twenty foot in width, ran east and west and abutted the north side of inlots 2527, 2528, 2529, 2530 and 2531 owned by the defendant, Joyce J. Salinger and leased to the Kroger Company.

As alleged in the petition, on September 2, 1892, there was filed for record with the recorder of Miami County a plat of a sub-division shown as Young's sub-division of a parcel of land then known as Outlot No. 147 of the City of Troy and this plat is recorded in Plat Book No. 2, page 123 of the Plat Records of Miami County, Ohio, and that plat of Outlot No. 147 aforesaid included the land now owned by the defendant, Joyce J. Salinger (PX 3, and stipulation number 3, R. 9-10).

On the second page of this plat there is the following: "I certify the above to be a correct plat of the sub-division of Outlot No. 147 in the City of Troy. The ground dedicated for streets and alleys are accurately shown, dimensions of the streets, alleys and lots are shown in feet and inches. Signed: R. F. Walker, County Surveyor." There also appears the following: "I hereby acknowledge the above plat as my act and deed and subscribe my name thereto. James H. Young."

"State of Ohio SS: Personally appeared before me the above-named J. Young and acknowledged the signing of the above plat. Witness my hand and notarial seal the day and year aforesaid. August 15, 1892. Seal. George Green, Notary Public."

There also appears on this plat the following: "This plat was approved by the City Council of Troy, Ohio August 23, 1892. Signed. Jno. Drury, City Clerk." Under that appears the name J. O. Davis. R. M. C. and the notation: "Received for record, September 2, 1892. Recorded September 3, 1892."

The alley on this plat was never opened. On the other hand it was never fenced off. The same land on which it was located was the subject of another plat filed in 1919. On July 21 of that year it was filed for record, as alleged in the petition, and is recorded in Plat Book No. 3, page 90. This is known as the Kerr-Smith Addition and as a subdivision of Outlots 246 to

252, both inclusive, and part of Outlot 147 west of the B. T. & I. R. R. and said plat is dated May 15, 1917. (See PX   , stipulation No. 4, and also PX 24 and DX E.)

The twenty foot strip of ground in question is not shown as an alley, raising the question as to whether or not there was a "vacation by implication." More about that later. Suffice it to say that as to the balance of this plat that it was duly platted.

From the time that any witness now available has any recollection the twenty foot strip was a typical farm lane with a fence on each side leading back to a barn. There is no evidence that it was ever enclosed with a fence but the inference which is warranted from all the facts is that the alley was never opened—yet never closed with a fence. They just never got around to developing the plat for many, many years. There was no building on the land now occupied by the plaintiff until 1941 or 1942 (R. 45) and not until then was the twenty foot alley put in use. As indicated previously, this building was so situated on the land that access to the back on the south was not possible without use of the alley. In other words the building ran right up to the south property line. Hence the plaintiff and his predecessors in title did use the alley as a means of ingress and egress to their building, but not for twenty-one years, so his claim that he has some rights as a result of adverse possession fails for lack of proof. The evidence on this point definitely preponderated in favor of the defendant.

When the supermarket was built for leasing to Kroger, title examination disclosed the unopened alley which defendant, Joyce J. Salinger, believed to be entirely her property. Hence the improvements closed the alley. As a means of removing any question Mrs. Salinger petitioned the City Council to "vacate" the alley and it was vacated as a means of clearing the title to the twenty foot strip in question (stipulation 18, R. 16). (This suit was initially against the City of Troy and the property owner but it was dismissed as to the City of Troy.)

The evolution of most of these facts is graphically and neatly shown in DX E, which was prepared under the supervision of an engineer. Another exhibit which will be helpful to one attempting to analyze this opinion is PX 24, in which the strip in question is the shaded area.

. This brings us to a summary of the questions raised besides adverse possession. In the first place was there a dedication of the alley? Second, was there a proper acceptance of the alley in 1892? Third, since it was never opened was there an abandonment? Fourth, was the alley vacated by implication by the re-plat in 1919 in which it was left out? Lastly, assuming that there was a due dedication, no abandonment, a proper acceptance and no vacation by implication, what is the right of the abutting owner, Mr. Ording, on the vacation?

It must be pointed out that none of the alley reverted to his land. All the alley was taken originally from the property to his south. Hence upon vacation the alley reverted to that property—the property of the defendant, Joyce J. Salinger.

With the contention that the alley was not duly dedicated the Court cannot agree, for reasons well stated in P. B. 5 et seq.

As to the acceptance defendants take the position with reference to the 1892 plat there was none because there was never any ordinance passed accepting the plat or alleys. They cite former Section 3723, General Code, which provided:

"No street or alley dedicated to public use by the proprietor of ground in any corporation, shall be deemed a public street or alley, or under the care or control of the council, unless the dedication is accepted and confirmed by an ordinance specially passed for such purpose."

The Court of Appeals for Cuyahoga County had that question before it in 1926 in the case of *Village of Bay* v. *Fidelity and G. Co.*, 24 Ohio App., 73, where at pages 77-78 they said:

"This section, however, was not intended as a limitation upon the general powers of a corporation in opening and improving streets, but as a restriction of the power possessed by others of imposing burdens and responsibilities upon the corporation. *Wisby* v. *Bonte*, 19 Ohio St., 238, 247; *Hermann* v. *Spitzmiller*, 24 C. C. (NS), 20, 22, 34 C. D., 453. It will be observed that in the section quoted no reference is made to plats and the recording thereof, but the section applies more particularly to the owner of ground who undertakes to dedicate a street to public use by means other than a plat. It might well cover instances in which that is done by means of a plat,

were not such a situation actually covered by Sections 3584, 3585 and 3586, General Code. * * *

"Section 3584, General Code. A proprietor of lots or grounds in a municipal corporation who subdivides or lays them out for sale, shall cause to be made an accurate map or plat of such subdivision, describing with certainty all grounds laid out or granted for streets, alleys, ways, commons or other public uses. Lots sold, or intended for sale, shall be numbered by progressive numbers, or described by the squares in which situated, and the precise length and width shall be given of each lot sold, or intended for sale. Such map or plat shall be subscribed by the proprietor or his agent duly authorized by writing, acknowledged before an officer authorized to take the acknowledgement of deeds, who shall certify the acknowledgment of the instrument, and recorded in the office of the recorder of the county.

"Section 3585, General Code. The may or plat so recorded shall thereupon be a sufficient conveyance to vest in the municipal corporation the fee of the parcel or parcels of land designated or intended for streets, alleys, ways, commons, or other public uses, to be held in the corporate name in trust to and for the uses and purposes in the instrument set forth and expressed, designated, or intended.

"Section 3586. When there are on record plats adopted by a platting commission or board of public works, no such map or plat of any addition within the limits of a municipal corporation shall be recorded until the engineer thereof certifies that the streets, as laid down on the plats of such addition, correspond with these laid down on the recorded plats of the platting commission or board of public works, * * * or in any municipal corporation where no platting commission is or has been in existence, no such plat shall be recorded until it has been approved by the council of the municipal corporation."

[These three sections are the same in all essential respects as Section 2601, Revised Statutes, which was in force at the time the land was platted in 1892, having been enacted in 1876, 73 v. 60.]

"It appears from these sections that an owner of ground within a municipality who divides it for purposes of sale may cause a plat of the same to be prepared showing the streets

thereon, and that, when such plat is *accepted by the municipality* [note it doesn't say by an ordinance specially passed for the purpose], and recorded, the fee of the streets thereof vests in the municipality in trust for the uses and purposes intended. The Supreme Court of Ohio has construed this section in *Kellogg* v. *Cin. Traction Co.*, 80 Ohio St., 331, 23 LRA (N. S.), 158, 17 Ann. Cas., 242. After quoting a part of Section 3584, the court, at page 343, says:

" 'When such map has been properly acknowledged and *approved by council of the city* and recorded in the office of the recorder of the county, it shall be deemed a sufficient conveyance to vest in the municipal corporation the fee of the parcel or parcels of land designated or intended for streets, alleys, * * *.' "

In the *Wisby case, supra,* there is no indication that the Supreme Court felt that former Section 3723, General Code, applied "more particularly to the owner of ground who undertakes to dedicate a street to public use by means other than a plat." On the contrary a plat was involved, one which was not accepted by an ordinance specially passed for the purpose. It is true that the street involved was one the Court found not dedicated in conformity to statute (245). The court nevertheless found a dedication by common law which operates by estoppel. The city was undertaking to improve the street and one resisting the assessments for the purpose said "it couldn't be done" because there was no acceptance by the city as required by 2 S. & C. 1514.

The Court said: "The object of section 63 was to prevent this charge from being imposed on the corporation without its unequivocal consent, which the section, to avoid all uncertainty as to the fact, requires to be manifested by an ordinance specially passed for the purpose.

"The section was not intended as a limitation upon the general power of the corporation in regard to opening and improving streets, but as a restriction of the power possessed by others of imposing burdens and responsibilities on the corporation."

*Hermann* v. *Spitzmiller et al.*, 24 O. C. C. (N. S.), 20 (Court of Appeals, Hamilton County, 1914) involved an attempt by a landowner to prevent the improvement on behalf of the city

of a street which was originally platted and later annexed to Cincinnati. There was no ordinance specially passed for the purpose of accepting the street in question which was on the plat, but the Court held that made no difference because Section 3723, General Code, was made for "the protection of the City against liability for care and maintenance of the street *rather than for the protection of its title.* * * *." (Emphasis supplied.)

It therefore held that the action of the platting commission under the law in force at the time of the annexation constituted a complete acceptance of the street.

This Court's conclusion is that the alley was "accepted" even though there was no ordinance specially passed for the purpose.

Since this was an unopened street it is clear that there was no abandonment because there is no proof that it was fenced and remained in the possession of the original proprietors for twenty-one years. Section 2305.05, Revised Code; 1 Ohio Jurisprudence (2d), p. 772, and cases cited therein, the most recent of which are *Orangeville* v. *Powell* (CP), 69 Ohio Law Abs., 440, 126 N. E. (2d), 86; *In re Loose*, 107 Ohio App., 47, 78 Ohio Law Abs., 399, 153 N. E. (2d), 146. And of course there was no proceeding to vacate or abandon the alley until recently, though it was claimed there was a vacation by implication when the Kerr plat (PX 4, stipulation No. 4, R. 7) was filed because it did not include the alley.

As to this suffice it to say that the court has been unable to find and has not been cited to any authority for vacation by implication. The clear import of the cases is that an alley can only be vacated or abandoned by a proceeding to vacate it.

"Vacation can be effected only by a substantial observance of all mandatory legal requirements, and usually the method prescribed is exclusive." McQuillan, "Municipal Corporation," Sec. 30, 196, citing *Lawrenceburg* v. *Wesler*, 10 Ind. App., 153, 37 N. E., 956.

Hence there was an alley, duly dedicated and accepted, not abandoned nor vacated by implication, or vacated at all until October, 1957. The entire alley was dedicated by the owner of one side of the alley and the final question is what are the rights of the abutting owner on the other side on vacation.

Section 723.08, Revised Code, provides: "The order of a legislative authority of a municipal corporation vacating or narrowing a street or alley which has been dedicated to public use by the proprietor thereof, shall, to the extent to which it is vacated or narrowed, operate as a revocation of the acceptance thereof by the legislative authority, *but the right-of-way and easement therein of any lot owner shall not be impaired by such order.*" (Emphasis supplied.)

Naturally, upon vacation, the fee in the land occupied by the alley reverted to the abutting property owners who are the successors in interest to the original grantor who dedicated the alley. There is no question about that. *Oberhelman* v. *Allen,* 15 O. N. P. N. S., 75; *Paul* v. *Wissalohican Camp Co.,* 104 Ohio App., 253 (1957).

As indicated above, the question is what does the other abutting owner have—the one whose predecessor in title gave no land for the alley?

A full statement of the applicable principles layed down by leading Ohio cases is in order.

"Distinct from the right of the public to use a street, is the right and interest of the owners of lots adjacent. The latter have a peculiar interest in the street, which neither the local nor the general public can pretend to claim: a private right of the nature of an incorporeal hereditament, legally attached to their contiguous grounds, and the erections thereon; an incidental title to certain facilities and franchises, assured to them by contracts and by law, and without which their property would be comparatively of little value. This easement, appendant to the lots, unlike any right of one lot owner in the lot of another, is as much property as the lot itself. *Lexington and Ohio R. R.* v. *Applegate et al,* 8 Dana Rep., 294; *Haynes et al* v. *Thomas,* 7 Ind. Rep., 38; *Lewis Street,* 2 Wend., 472; *Livingston* v. *Mayor of N. Y.,* 8 Wend., 85; *Rowans Ex'rs.* v. *Town or Portland,* 8 B. Monroe, 232; *Bingham* v. *Doane,* 9 Ohio Rep., 165; *LeClero* v. *Gallipolis,* 7 Ohio Rep., 218; *Tate* v. *Ohio and M. R. R. Co.,* 7 Ind. Rep., 480.

"In *Bingham* v. *Doane,* 9 Ohio Rep., 167, Lane, C. J., in relation to a highway, says: 'Its existence generally contributes to the enjoyment of the adjacent lot, and confers additional value upon it, and any act of another, which impairs that value,

or interferes with that enjoyment, may be the subject of a suit.' * * * 'The easement—the privilege of the road—the advantage it confers on his land is his, but not the road itself. The right lies not in livery, but in grant.'

"This appendant easement forms a large part of the consideration paid for lots, and is of such intrinsic value to lot owners that, in most cities, assessments for the improvement of streets are made upon the adjacent lots, instead of the city generally." *Crawford* v. *Village of Delaware,* 7 Ohio St., 459, 469.

"With the fact, known and appreciated by everybody, that a large part of the value of lots in towns, was made up in reference to their location upon streets, and with a long course of decisions, enforcing the liability of municipal corporations for invasions of this right, it still took nearly twenty years to bring it to a clear and definite description. But, at length, in the case of *Crawford* v. *The Village of Delaware,* 7 Ohio S. Rep., 459, it was placed upon the true ground, as a right of property, protected by the constitution which could not be taken from the owner without compensation. The court says: 'The latter (lot owners), have a peculiar interest in the street, which neither the local nor the general public can pretend to claim; a private right of the nature of an incorporeal hereditament, legally attached to their contiguous grounds, and the erections thereon; an incidental title to certain facilities and franchises, assured to them by contracts and by law, and without which their property would be comparatively of little value. This easement, appendant to the lots, unlike any right of one lot owner in the lot of another, is as much property as the lot itself.' Upon a doctrine so just and necessary, and resting upon foundations so solid and satisfactory, it can matter very little, that our conclusions are not concurred in by the courts of some of our sister states. It is nevertheless the law of this state, and no longer open to doubt or question. This case also indicates very clearly, when, and under what circumstances, this private right of property can be said to be invaded." *Railway* v. *Cumminsville,* 14 Ohio St., 523, 546-547.

In *McQuigg et al* v. *Cullins,* 56 Ohio St., 649, a county road was vacated and its closing was enjoined. A new road had been

made, but its use by plaintiff was not convenient nor practical except by the expenditure of a large amount of money. Plaintiff purchased relying upon the fact that the road would remain forever open, paid full price, would not have bought except upon the fact that the road so remain open and at great expense to himself erected buildings, etc. The Court held (Syl. 2) that the road could be vacated but where the others threatened to close up the road injunction will lie "And if it appear that such threatened action will destroy the easement of an owner of adjacent land in such road, and no other road reasonably suitable to meet the necessities of such owner has been provided, injunction forbidding such obstruction or closing up such road will be granted."

"An easement in a street or other highway, appurtenant to an abutting lot partakes of the nature of land, it is a part of the lot to which it is appurtenant, passing to a purchase [R] with a conveyance of the lot, and descending to the heir on the death of the ancestor, *Railroad Co.* v. *Gardner*, 45 Ohio St., 318; *Railway Co.* v. *O'Harra*, 50 Ohio St., 667; *Crawford* v. *Village of Delaware*, 7 Ohio St., 469." *Railroad* v. *Lersch*, 58 Ohio St., 639, at 651.

"The decisions in this state have clearly established that an abutting lot owner had such an interest in the portion of the street on which he abuts, that the closing of it up, or the impairment of its use as a means of access, or the addition of a new burden, is a taking of private property for a public use, and cannot be done without compensation. *McCombs* v. *Akron*, 15 Ohio, 474; *Crawford* v. *Delaware*, 7 Ohio St., 459; *Street Railway* v. *Cumminsville*, 14 Ohio St., 523." *Kinnear Mfg. Co.* v. *Beatty*, 65 Ohio St., 264, 282.

In *Paul* v. *Wissalohican Camp Co.*, 104 Ohio App., 253 (Ct. of Appeals, Madison County, 1957), there was a re-location of a road to eliminate an angle. The re-location made the base of a flat triangle, the old portion of the road constituting the other two sides. One side of the triangle ran in a northeasterly direction and the other side ran more northerly direction. The first side was the boundary line between plaintiff and defendant —this line extended. The defendant had two entrances to his property, one accessible to the new highway and the other one

farther to the northeast but just before the bend in the road or the angle in the road not accessible to the new road except over the vacated road. The triangular piece was appropriated.

Of course the vacated road reverted to the abutting owners, subject to existing easements. *Kinnear Mfg. Co. v. Beatty*, 65 Ohio St., 264, 62 N. E., 341, 87 Am. St. Rep., 600; *Greenberg v. L. I. Snodgrass Co.*, 95 Ohio App., 307, 119 N. E. (2d), 114, aff'd., 161 Ohio St., 351, 49 A. L. R. (2d), 974.

"The Camp Co. (defendant) owned an easement in the old right-of-way from the old terminus of East Drive. *McQuigg v. Cullins*, 56 Ohio St., 649; *Kinnear Mfg. Co. v. Beatty, supra,* 282; *Greenberg v. Snodgrass, supra;* 18 Ohio Jurisprudence (2d), 522, Easements, Sec. 4.

"The agreed statement of facts shows that East Drive served the low lying part of the Camp Company's land, while the drive to the west served the higher elevation.

"The Camp Co. had asked that if it is denied use of the extension of East Drive it be declared entitled to access to the relocated highway by use of the section of the old right-of-way lying northeast of the angle, which has now been vacated as a public highway. We believe it to be so entitled. * * *

"An abutting owner's easement in a vacated highway must be distinguished from an easement of necessity, which received some mention. An easement of necessity arises upon a grant in favor of land which would otherwise be inaccessible, 28 Corpus Juris Secundum, Sec. 695, Easements, Sec. 35; whereas a private easement in a public highway is already in existence when the highway is vacated, *and continues if there is reasonable need for it.*

"*Continuation of the abutting owner's easement after vacation does not depend upon absolute necessity. It is enough that no other road is reasonably suitable to meet the necessities of such owner.* Hence the Camp Co. is not to be limited to use of its partial access on the west if it is not convenient or practicable except by the expenditure of a large amount of money. *McQuigg v. Cullins, supra.*" (Emphasis added.)[1]

---

1. On this subject see also *Oberhelman* v. *Allen*, 15 ONPNS 75. For a situation in which an owner abuts on an alley, *part of which other than the part on which he abuts,* is vacated, see *Bulen* v. *Moody*, 77 O. A. 61 (Court of Appeals of Franklin County, 1945). There it was held that to

In the language of the *Paul case* the question boils down to this—is there a "reasonable" need for the continuance of Ording's private easement. It does not depend upon absolute necessity. It is enough that no other road is reasonably suitable to meet the necessities of such owner.

Let us look at the evidence on this. There is no easement to the back of Ording's property. We have already seen that the building which he purchased was within two feet of his property line on the south so it was necessary for him to use the alley for ingress and egress to his back on the south side. However, there is room on the north side.

The plaintiff bought his property in 1953 from Mr. Sarver (R. 80). It was then in use by a garage man and the area south of the building was a graveled area with tracks going around to the back. He used it to get to the back of the building and "on around" (R. 82). Others used it to make deliveries to his back door, as his front is used for parking and display purposes and it is therefore not convenient for deliveries to be made to the front door.

Plaintiff made repairs and put gravel on this strip in question and used it until the curb was put up (R. 82).

He said (R. 84 et seq.) his lot has 135 feet frontage and is 194 feet deep on the south and 192 feet on the west; his building is 60 feet by 80 feet and runs north and south. In it he operates a wholesale and retail fruit market and a beer and wine carry-out.

Of course closing the alley cut off his ingress and egrees to the rear of his building on the south (R. 86) because of the curb which was erected on the north line of the former alley by defendant Salinger and because the rest was made into a parking lot.

---

entitle the abutting property owner to enjoin the obstruction of the vacated alley by the property owners to whom it reverted, the inconvenience he suffered must be different in kind from that of the general public and not merely different in degree. In that case the abutting owner had access to his lot from three sides after the vacation proceedings, and it was held he was not entitled to a permanent easement affording ingress and egress over such vacated alley to his property for the benefit of himself and his successors in title, "he having other reasonable means of access to his property and his damage differing only in degree and not in kind from the general public."

According to the plaintiff, and it was not controverted, there were five or six deliveries a week and the alley was used every day by himself (R. 82, 89). According to his testimony further, big trucks cannot get to the back now (R. 90) and they have to unload at the front and this is not adequate.

Furthermore, he said (R. 90) since the alley is cut off he can't use the premises as he used because it is "too inconvenient." Also, the unloading by big trucks in front (R. 90-91) makes less ample the space for parking.

The building has large doors (12' x 14') and the witness said arrangements were made during the summer of 1957 for cars to drive through them to the rear and make turns to come out on the north side of the building, a thing not required before the alley was cut off (R. 92).

He also testified (R. 92 et seq.) that for four years he has planned an addition (30' x 60') on his north side for a beer and wine carry out, a business in which he is presently engaged, his cooler being on the northwest corner of his building.

In connection with deliveries having to be made at the front of the building the witness said his parking lot in front will accommodate 10 to 15 customers (98) and when some are parked to the north it is impossible to get to the rear of the building on the north (100), and it can be inferred that if the lot was full it would be inconvenient to make deliveries at the front.

The witness was not permitted to say whether he would have purchased the building if he had known that he would not have been permitted to use the alley (R. 101-104) but it may certainly be inferred from what was testified to that the plaintiff may well have relied on the existence of the alley when he bought, even though the deed by which he acquired the property (DX A) may have referred to a survey on which the alley did not appear, a matter about which the plaintiff was cross-examined (R. 107 et seq.). A layman is much more apt to go by what he sees on the ground than what is in documents he receives.

Cross-examination (111 et seq.) also brought out that plaintiff's building is 30 feet back from the old Dixie. Part of the building is two feet from the south line and his frontage is 139½ feet so he has a minimum of 35 feet between the north line of his building and the railroad. Further—it is 91 feet

from the old Dixie to the back of his building; the lot is 192 feet deep on its shortest side and the building is 60 feet deep so he has at least 50 feet to the rear of the lot. Also, there is a graveled and dirt area to the north side of the building.

On these facts it is clear that there was a reasonable need to plaintiff for the continuance of the private easement in the public alley which was vacated. Plaintiff will suffer from the vacation in a way quite different in kind from the general public in that it cuts off the access to the rear of his commercial building used by him and his predecessors in title, granted that he still has some access on the north which, because of the way his customers occasionally park, would be inconvenient at times and which, if used, forecloses the possibility of expansion of the building on the north. Also, closing the alley cuts off the valuable feature of his property that by use of the alley he, customers, and those making deliveries can go around the building.

If the injunction should be denied it would not require the expenditure of a large amount of money for plaintiff to have access to the rear of his building, but it would foreclose the possibility of expansion to the north and it would be less convenient and practical than it was prior to the closing of the alley because it will no longer be possible to go clear around the building.

Hence, it is the conclusion of the Court that under *Paul* v. *Wissalohican Camp Co.*, and the other applicable authorities the plaintiff is entitled to the injunction he seeks.

There is a claim by the defendants in their amended answer that any relief should be denied plaintiff because of laches, in that the defendant saw the grading and black topping of the parking lot progress and did not file suit until eight days after it was completed. In this connection the plaintiff testified that he was present at council meeting of the City of Troy October 7, 1957, when the proposed ordinance to vacate the alley was read and he objected to it. (R. 93-95.)

Kroger graded the area in question in the fall of 1957 (118) and blacktopped the area in question September 5, 1957, and the petition was filed September 13, 1957 (119). He said he tried to get it stopped long before that (120), having hired an attorney in August.

Thus plaintiff was stirring himself and, considering the novelty and complexity of the questions presented the fact that he did not file suit before he did is understandable. Hence there was no proof of laches.

The Court therefore finds on all the issues except adverse possession in favor of the plaintiff and against the defendant Salinger and Kroger and an entry to that effect should be furnished, with costs taxed to the defendants Kroger and Salinger.